## MARYE *v.* STROUSE.

*(Circuit Court, D. Nevada.    January 20, 1880.*'

1. AGENT.

   An agent to buy cannot be the seller.

2. BROKER'S CONTRACT.

   An ordinary broker's contract for the purchase of mining stock, each share of which has an independent value, is not an entire contract.

3. SAME—CUSTOM.

   A custom of charging customers an arbitrary sum for telegrams, usually much more than the actual cost, if it can be considered reasonable, ought to be established by very satisfactory proof, and it should appear that both parties knew of it.

4. ACCOUNT STATED—BROKER'S PASS-BOOK.

   Under the circumstances of this case, the balances struck in a "broker's pass-book" *held* accounts stated.

5. SAME—INTEREST—APPROPRIATION.

   Where a statute does no more than prohibit a recovery of interest in excess of 10 per cent. unless the contract is in writing, but does not otherwise make the rate of interest unlawful, interest in excess of that rate may be included in an account stated, and money paid on account by the debtor may be applied to the payment of such interest by the creditor in the absence of any appropriation by the debtor.

*Kirkpatrick & Stevens* and *Lewis & Deal,* for plaintiff.
*Jonas Seely,* for defendant.

HILLYER, D. J. This is an action to recover a balance alleged to be due upon a mining-stock account. The complaint alleges the purchase upon defendant's request of a large amount of mining stocks; the expenditure of money for telegrams in connection with the buying and selling of the stocks; the advancing of money on purchases, and the agreement of defendant to pay interest thereon at the rate of 2 per cent. per month. It also contains a number of counts upon accounts stated. The answer puts in issue the purchase of 500 shares of Franklin stock, at three dollars per share; denies the correctness of the charges for telegrams, and any agreement to pay interest at the rate of 2 per cent. per month. These are the only issues raised. The facts bearing upon each point can be best stated as it is decided, both for convenience and to avoid repetition. The facts in regard to the purchase of the Franklin stock are that the defendant requested the plaintiff's assignors, Frankel & Block, stock brokers, to buy for him 500 shares of Franklin, at a limit of three dollars per share. Frankel & Block purchased in the San Francisco stock board next day, in the usual way, 125 shares of Franklin, that being all that could be obtained at three dollars per share. At the same time Frankel, one of the members of the firm, being a large owner of Franklin stock, turned over to Frankel & Block, for the purpose of filling the defendant's order, 375 shares of Franklin at three dollars per share, which were then applied by the firm to that purpose, and were charged to the defendant with the usual commissions and telegrams. The defendant never received the stock into possession, and never assented to this mode of filling his order; nor did he know it had been so filled until about the time of bringing this suit.

The rule of law applicable to this state of facts is settled. An agent employed to buy cannot become the seller, in the absence of his principal's assent, given upon full knowledge of the facts. Frankel & Block, as agents of Strouse to purchase, could not be the sellers. It is not claimed that there was any fraud in fact here, but evidence establishing the transfer of the stock to have been *bona fide,* and for a fair

price, is unavailing. The inquiry does not reach the question whether there was or was not fraud in fact. It stops when it is ascertained that the agent was both buyer and seller. The law then declares the sale invalid, if the principal elect to so consider it, not because all sales so made are in fact fraudulent, but because it will not permit any trustee or agent to purchase on account of another that which he sells on account of himself. It does not permit the agent to be lead into temptation by an act which raises a conflict between his integrity and his self-interest.

The supreme court of the United States announced this doctrine in very strong terms and with unanimity in *Michoud* v. *Girod,* 4 How. 503. The current of authority in England, as well as here, is all the same way. 4 Kent's Com. (7th Ed.) 475; *Conkey* v. *Bond,* 34 Barb. 276.

The manner in which the stock passed from Frankel to Frankel & Block, and from them to Strouse, does not, in my judgment, essentially alter the case. The fact that an account may have been stated between the defendant and Frankel & Block, in which this item of 500 shares of Franklin was included, does not bind the defendant, if he stated the account in ignorance of the facts. It appears that Frankel & Block never informed the defendant how the purchase had been made, and that the defendant did not, in fact, know of it until at or about the time of bringing this suit. The charge in the account which was rendered to defendant, being for 500 shares of Franklin at three dollars per share, gave him no information in regard to the person from whom the stock was purchased. The charge was for a quantity and for a price within the limit of his order, and he may, and naturally would, have supposed it had been filled in the regular way.

There was nothing to put him on inquiry, and he may now open the account for fraud, actual or constructive. So any payments the defendant may have made in ignorance of the facts cannot be binding upon him, however appropriated, so as to prevent him from avoiding the transaction when he discovers the truth.

So far, then, as the 375 shares are concerned it seems clear that there is no liability on the defendant's part; but that he is properly chargeable with the 125 shares, which were regularly purchased in the board, has hardly been seriously contradicted. It was suggested, however, that the order for 500 shares might and ought to be regarded as an entire contract, and that the defendant was not bound to take less than the whole 500 shares. A sufficient answer to this position is that, upon receiving the defendant's order to buy 500 shares at a limit of three dollars, the undertaking of Frankel & Block, as brokers, was not to deliver the whole absolutely, but to buy so much as could be bought in the regular way below or at the limit. Moreover, there are no circumstances in this case showing, or tending to show, that the defendant regarded the purchase of the whole number of shares as essential to the value of a part. An ordinary broker's contract for the buying of stock, each share of which has a distinct and independent value, cannot be regarded as entire. The result upon this stock transaction is that the defendant is entitled to a credit for 375 shares, at three dollars per share, for commissions, and for interest thereon, at the rate of 2 per cent. per month, from September 28, 1874, down to the —— day of ———, 187–, and at 10 per cent. per annum thereafter, so long as those rates have been charged against him in the account sued on.

The charges for telegrams were made in this way: Frankel & Block were in the habit of receiving orders daily for the purchase and sale of mining stocks. It often happened that a number of orders would be sent to San Francisco in one dispatch. In such case the practice was to charge each customer having an order therein 75 cents, (that being the proper charge for a single telegram of 10 words,) although such customer's proportion of the actual cost was often, if not always, much less. Sometimes a single order would be sent for one customer, and then the actual cost of the telegram was charged. But how often this may have been done in defendant's case nowhere appears. No effort was made to keep an account of the sums actually paid out for telegrams about his

business. The plaintiffs defend these charges on the ground that they are in accordance with an established custom of mining stock brokers. The testimony fails to bring knowledge of this custom, if any, home to Strouse. He never agreed to the charges, nor did Frankel & Block ever inform him of their character. He himself denies any knowledge of the custom, if it be a custom.

I think, also, that the testimony fails to show that the alleged custom had existed so long, and was so generally known, that the defendant ought to be presumed to have had knowledge of it, and to have contracted with reference to it. The only evidence on this point is that of Mr. Frankel.

In answer to the question whether this mode of charging "was a custom among the brokers, and was well known," his answer is, "I tell everybody; make no bones about it." Again he answers: "It (the mode of charging) is well known; we don't make any bones about it—tell everybody." This shows that there was nothing clandestine about the charges, but does not show a certain and uniform custom among brokers which was known to both parties.

A custom or usage like this, of charging customers, in addition to commissions, not merely the actual cost of telegrams, but an arbitrary sum, ordinarily much more than the actual cost, if it can be considered reasonable, ought to be established by very satisfactory proof, and it should also appear that both parties had knowledge of it.

Strouse says he expected to pay the actual cost of the telegrams about his business, but nothing more. There is, however, no proof showing what the real cost was. It being conceded that the charge is excessive, unless supported by custom, the burden of showing what the real cost of telegrams was is on the plaintiffs. But this has not been done, and the charge must stand or fall as a whole. I do not think it can be sustained on the ground of custom. Nor do I think that in reference to these charges the defendant has lost his right to object to them because he may have stated an account including them, or because payments made by him may have been appropriated by Frankel & Block to their payment.

For this reason the account as rendered to defendant contained the usual charge of the telegraph company for a dispatch of ten words or less, viz., 75 cents, and while the charge was false in fact it would appear to the defendant to be true so long as he remained ignorant of the broker's habit of charging. Until this became known to him there was nothing on the face of the account calling for objection by him. As to usage, see *Renner* v. *Bank of Columbia,* 9 Wheat. 581; *Bowling* v. *Harrison,* 6 How. 248; *Pierpont* v. *Fowle,* 2 W. & M. 23.

The only other portion of the account objected to by the defendant consists of the various charges for interest, at the rate of 2 per cent. per month, which he asserts are illegal, because no agreement in writing has ever been made to pay that rate.

The plaintiff claims that all items of interest accruing prior to August 1, 1875, are included in a number of accounts stated, contained in a book in evidence called a "broker's pass-book;" and that since, under the law of this state, there is nothing illegal in a verbal agreement to pay interest at the rate charged, an account stated may lawfully be settled by the parties, with items of interest at that rate entering into the balance struck and agreed to. A statute of Nevada (Comp. Laws, § 32) provides that "when there is no express contract in writing, fixing a different rate of interest, interest shall be allowed at the rate of 10 per cent. per annum for all moneys. * * * Parties may agree in writing for the payment of any rate of interest whatever on money due, or to become due." After judgment, the original claim bears interest at the contract rate. There is nothing anywhere in the statute prohibiting persons from paying or receiving any rate of interest they choose. The only effect of the law is to prevent a recovery by suit of more than 10 per cent. per annum when there is no agreement in writing. Properly speaking, 2 per cent. per month is not an illegal rate of interest in Nevada. If parties see fit to contract in writing, any rate so fixed can be recovered; but if the agreement is not reduced to writing, they cannot have the aid of the courts in enforc-

ing it when the debtor refuses to abide by the verbal agreement.

In such case, however, the agreement being fair and perfectly understood by the party charged, such interest may be included in the balance agreed to upon stating an account. There is nothing in that opposed to good morals, or to the policy of the law in this state. And since the stating of the account alters the nature of the debt and amounts to a new promise, (2 Greenl. Ev. § 127,) and it is not necessary to prove the items of the account, but simply the assent, express or implied, of the debtor to the balance stated, a recovery may be had upon such an account unless it is successfully impeached for fraud or mistake. Under the circumstances of this case it appears to me that the balances struck in the "broker's pass-book" must be regarded, upon settled principles of law, as accounts stated. The book is kept for the express purpose of showing the customer how his account stands. It has on the debit side charges against Strouse for stocks bought, commissions, telegrams, assessments, and interest. On the credit side appear the proceeds of stocks sold, money paid in on account, and dividends collected. The course of business in the brokers' office was to balance all stock accounts at the end of each month. The balance was carried forward as the first item of the next month's account.

Interest on all advances during the month, as well as on the balance brought forward from the preceding month, was charged at the rate of 2 per cent. per month at the expiration of each month, and went into the balance struck. The pass-book is a copy of the broker's ledger. Whenever it was brought in by the defendant it was written up by copying into it the entries from the ledger, and then returned to him, he having at all other times possession of the book. The first balance was struck August 31, 1874, and the last July 31, 1875. Every account and every balance made contains a charge for interest at the rate of 2 per cent. per month. In charging the item for interest it is not stated to be at the rate of 2 per cent., but the amount shows that to have been the rate. No objection was ever made by the defendant to this,

or any other portion of this account, until the bringing of this suit in November, 1877. It thus appears that he retained the last account more than a year without objection. This warrants fully the presumption that he acquiesced in the accounts, and it is unnecessary that he should have given an express assent. *Wiggins* v. *Burkham,* 10 Wall. 129. The defendant, however, says that acquiescence ought not to be presumed, because he did not in fact know what rate of interest was charged to him in his accounts.

It is perhaps a sufficient answer to this to say that, having been in the receipt of these monthly accounts for a year, if he did not know he should have known that he was bound to examine them enough to discover what a very slight examination would have disclosed, upon the principle that a party is chargeable with knowledge when the means of knowledge are within his reach. *Ogden* v. *Astor,* 4 Sandf. 332. It would, indeed, be wrong to permit the defendant to lie by without objection while his broker advanced large sums for him upon the understanding that the rate of interest was to be as charged. But there can be no reasonable doubt that Strouse did know and assent to the rate of interest as charged. His account was large, the interest charge alone some months amounting to over $800.

The account for July is as follows:

| | | | | | |
|---|---|---|---|---|---|
| July | 1. | To balance, | | | $39,695 73 |
| " | 10. | Assesst. 200 Davey, | | | 100 00 |
| " | 30. | 30 Ophir, 57, | | | 1,710 00 |
| | | Com. and tel. | | | 18 60 |
| " | 31. | Interest, | | | 817 50 |

*Cr.*

| | | | | | |
|---|---|---|---|---|---|
| July | 12. | Div'd 50 con. va., | | | 500 00 |
| " | 31. | Balance, | | | $41,841 83 |

It is impossible to believe that any business man could receive so simple an account and not know from it the rate of interest he was charged. The testimony shows that these accounts were rendered for the purpose of informing the defendant how his account stood. The dealings between the

parties extended through a period of over two years, during
all of which time interest was charged monthly at 2 per cent.
It appears, also, that at this time the bank rate as well as
the brokers' rate in Virginia City was 2 per cent. per month,
and that the defendant did business with nearly or quite every
broker and banker in the city. I find, then, that Strouse
knew the rate of interest charged against him in his account.
There was no mistake or fraud about it. Having this knowl
edge, he not only receives and retains accounts without ob-
jection, but even pays them. The method of keeping and
rendering accounts continued so long as to become a regular
course of dealing between the parties. Under such circum-
stances the authorities are clear that an account stated cannot
be opened because an item of interest which went into it
could not have been recovered by suit, provided such item is
not illegal. *Backus* v. *Minor*, 3 Cal. 231; *Young* v. *Hill*, 13
N. Y. S. C. 613; *Bainbridge* v. *Wilcocks*, Bald. 536; *Treeland*
v. *Herron*, 7 Cranch, 147.

After July 31, 1875, no accounts were stated between the
parties. The defendant did not bring his book in to have it
written up after August, 1875. The balance against him
July 31st was $41,841.83. Dealings still continued between
the parties as before for a long time, the last item on the
debit side bearing date December 24, 1876, and the last on
the credit side August 14, 1877. After August 1, 1875, the
account was kept on plaintiff's books as before. Monthly
balances were struck, embracing current charges and interest
as well on the balance from the preceding month as on cur-
rent advances. Credits arising from sales of stock, dividends,
or cash were set opposite these charges and deducted from
the debit side, the balance so struck being carried forward
and making the first item of the next monthly account. The
defendant paid all moneys in generally on account, never
making any application of them, but they were applied as
paid in or received by the brokers to the payment of all back
indebtedness, including the interest at 2 per cent., the appli-
cation being made to that account which had accrued first in
point of time.

The right of the plaintiffs to apply the payments so made to that portion of the account which is for interest at 2 per cent. per month is denied. The argument is that the charge for interest is illegal, and while the creditors in this case had a right to apply the payments, his right is confined to demands which are legal, and can be enforced. Upon this point the law seems entirely settled. So far as I can discover, there is no conflict of authority. The established rule is that when a creditor has two demands, one of which is lawful and the other unlawful,—that is to say, arising out of some contract prohibited by law,—the creditor can apply an unappropriated payment only to the lawful demand. *Rohan* v. *Hanson,* 11 Cush. 44; *Caldwell* v. *Wentworth,* 14 N. H. 431; *Bancroft* v. *Dumas,* 21 Vt. 456.

But many demands are lawful which cannot be recovered by a suit at law, and to the payment of all such demands the creditor may lawfully apply money paid to him by his debtor, whenever the debtor fails to make any appropriation. Thus a debt barred by the statute of limitations may be liquidated in preference to debts not barred. *Ramsey* v. *Wasner,* 97 Mass. 8; *Mills* v. *Fowkes,* 5 Bing. (N. C.) 455; *Williams* v. *Griffith,* 5 M. & W. 300.

So in cases where no recovery can be had because the promise is not in writing, as required by the statute of frauds. *Haynes* v. *Nice,* 100 Mass. 327; *Murphy* v. *Webber,* 61 Me. 478.

In like manner, where a statute did not prohibit the sale of liquor, but enacted "that no person should maintain any action for sums for or on account of spirituous liquors," it was held the seller might apply an appropriated payment to the account for liquors and sue for other articles. *Philpott* v. *Jones,* 2 A. & E. 41; *Cruikshank* v. *Rose,* 1 Mood. & Rob. 100. So, where the creditor had an equitable demand, arising out of partnership relations, he was allowed to apply payments, made generally, to the equitable claim, and sue at law for his legal demand. *Bosanquet* v. *Uray,* 6 Taunt. 597. These cases illustrate the distinction which is made between contracts "which the law simply declines to enforce, and those which it directly prohibits." *Phillip* v. *Moses,* 65 Me. 70.

Payments may be applied by a creditor to demands not recoverable at law, when no statute prohibits the contract, but simply denies a remedy to enforce them. In such cases the contract is not illegal, and the money, if voluntarily paid, cannot be recovered back. But the right does not extend to contracts which are "prohibited by law under heavy penal forfeitures and payments, which may at once be recovered back because illegal." So held where a payment had been applied to a grossly usurious contract which could not have been enforced, and the law gave the debtor a right to recover back three times the amount paid for usurious interest. *Rohan* v. *Hanson, supra.*

That under the statute of Nevada an agreement to pay 2 per cent. per month interest is lawful, although not in writing, and that such interest is a proper item to enter into an account stated, has just been decided. It is equally clear that under the same statute it is perfectly legal to pay that rate without any written agreement to do so.

Money so paid cannot be recovered back if the payment was voluntary. In the recent case of *Marvin* v. *Mandel,* 125 Mass. 562, the decision was upon a statute of that state which allows parties to contract in writing for any rate of interest, but, unless the contract is in writing, no more than 6 per cent. can be recovered by action; and upon this it was held that, without a written contract, it was lawful to pay and receive a greater rate than 6 per cent., and that, when voluntarily paid, it could not be recovered back.

In this case the last payment was made some months before any controversy arose about the charge for interest, and there is but one conclusion possible upon all the authorities, and it is that the creditors had a lawful right to apply the unappropriated payments of Strouse to extinguish the oldest items of the account, including those for interest at the rate of 2 per cent. per month. Had the creditors done nothing more than to set the items of credit opposite the debits, this of itself would have amounted to an application of them to the payment of those debits. *Clayton's Case,* 1 Meriv. 608; Willard's Equity, 102. And, in the absence of any specific

application by either party, the law would apply the credits, as Frankel & Block did, to the payment of the items and balances "according to the priority of time." Id.; *U. S.* v. *Kirkpatrick*, 9 Wheat. 720.

My conclusion upon the whole case is that there must be a general finding of fact for the plaintiffs, the amount of the judgment to be ascertained in accordance with the foregoing opinion.