[Civ. No. 8576. First Appellate District, Division One.—January 12, 1933.]

PHILIP G. HERRLEIN et al., Plaintiffs and Respondents, v. FRED A. TOCCHINI et al., Appellants; LILIEN-THAL, BREMER & CO. (a Copartnership), Defendant and Respondent.

Bianchi & Hyman and C. G. Morse for Appellants.

Young, Hudson & Rabinowitz for Plaintiffs and Respondents.

Orrick, Palmer & Dahlquist for Defendant and Respondent.

WOODWARD, J., *pro tem.*—This is an appeal by two of the defendants, Fred A. Tocchini and H. J. Tocchini, from a coercive declaratory judgment in favor of plaintiffs.

The factual background of the controversy, being somewhat involved and having unusual ramifications, will be set forth chronologically and at length: On or about May 15, 1928, the appellants, Fred A. Tocchini and H. J. Tocchini, the former being the more active in the transaction, gave a telephone order to Lilienthal, Bremer & Company, brokers, for a "buyer 60" contract covering 200 shares of Bancitaly stock. Prior to said date respondent Philip G. Herrlein had informed Lilienthal, Bremer & Company that he desired to enter into a "buyer 60" contract as seller. Accordingly, when the brokerage firm received appellants' telephone order it immediately purchased on the stock exchange for the account of Herrlein 200 shares of the stock specified by appellants. Confirmation of the purchase was forwarded to Herrlein, who, in due time, paid for same with his personal check. The stock was thereafter indorsed and left with the brokers for sale to appellants under the terms of the contract requested. Appellants were duly informed, in writing, of the purchase of said stock and they immediately deposited the sum of $12,000 with Lilienthal, Bremer & Company to protect the seller. A member of the brokerage firm then prepared an escrow agreement, which, after some delay, was duly signed by Sylvia C. Herrlein (acting as agent for her brother Philip G. Herrlein) and appellant Fred A. Tocchini. The agreement, together with the cash deposit, was forwarded to Wells Fargo Bank & Union Trust Co., as escrow-holders. The escrow agreement is as follows:

"San Francisco, May 16, 1928.

"To Wells Fargo Bank & Union Trust Co.,

"Union Trust Office.

"The undersigned, Fred Tocchini, hereinafter called the Buyer, hereby deposits with you the sum of $12,000.00, and the undersigned, Sylvia C. Herrlein, hereinafter called the seller, hereby deposits with you 200 shares of Bancitaly Corporation; said money together with said shares of the Banc-

italy Corporation is to be held by you in escrow on the following terms and conditions:

"1. Upon deposit with you by the Buyer of the total sum of $45,657.50 including the sums hereinabove mentioned on or before July 16, 1928, said total sum is to be paid to the seller and said shares of the Bancitaly Corporation are to be delivered to the buyer.

"2. Whereas the undersigned as between themselves have agreed that the buyer shall at all times keep a deposit of 25% of the market value of the security in escrow. You shall forthwith, upon notice from Lilienthal, Bremer & Co., that said Buyer has failed to meet the requirements as above stated, pay to the Seller the sum of $1,600.00 plus the difference between the market price on the date you receive the notice and the total sum specified in paragraph No. 1, together with 200 shares of Bancitaly Corporation, and pay to the other party any balance of the deposit made by such other party.

"F. A. Tocchini, Buyer

"Sylvia C. Herrlein, Seller."

Thereafter on June 18, 1928, the Wells Fargo Bank & Union Trust Company advised the brokerage firm that it had decided not to act as escrow-holder and returned the cash deposit, together with the stock and the agreement, to the brokers. Respondent Lilienthal, Bremer & Co. at all times thereafter retained in its possession the stock and all papers pertaining thereto. During the month of June, 1928, the brokerage firm, because of fluctuations in the price of the stock, called upon the appellant Fred Tocchini, from time to time, to furnish additional collateral in order that his "buyer 60" contract would be protected. In each instance appellant complied with the demand, depositing in all 263 shares of Bancitaly stock, including 110 shares which the trial court found did not belong to either of appellants. During the latter part of June of the same year, after the stock had suffered an appreciable decline in price, Fred Tocchini called upon the brokerage firm and requested a copy of the escrow agreement, which was furnished him. Thereafter on July 3, 1928, appellants made a written demand upon Lilienthal, Bremer & Co. for a return of all stocks previously deposited with the said firm. On October 25, 1928, respondent Herrlein made written demand upon

Fred Tocchini that he pay the purchase price of the stock covered by his "buyer 60" contract. Appellants thereupon declined to proceed further with the transaction and respondent Herrlein made demand upon the brokerage firm that it sell sufficient of the collateral, which, with the cash deposit of $12,000, would equal the purchase price of the stock, to wit, $45,657.50. The brokers refused to comply with the demands of any of the parties, with the result that the Herrleins filed an action against appellants and the brokerage firm wherein they prayed for a coercive declaratory judgment, defining the legal rights and duties of all the parties.

The trial court found that on May 16, 1928, the defendant Fred A. Tocchini had agreed to purchase 200 shares of Bancitaly stock from Philip G. Herrlein for the sum of $45,657.50, said sum to be payable by defendants at any time within sixty days after the date of said sale; that concurrently therewith and for the purpose of securing the payment of said purchase price and of insuring the delivery of said stock, the plaintiff Sylvia C. Herrlein and the defendant Fred A. Tocchini agreed that said 200 shares of capital stock of Bancitaly Corporation should be deposited by said defendant with the Wells Fargo Bank & Union Trust Company as escrow-holder, and that in order to carry out the intention of said parties an escrow agreement was prepared by defendants Lilienthal, Bremer & Co. and signed by plaintiff Sylvia C. Herrlein and defendant Fred A. Tocchini; that Fred A. Tocchini defaulted in the payment of the purchase price of said stock; that defendant Fred A. Tocchini is indebted to plaintiff Philip G. Herrlein in the sum of $45,657.50, with interest thereon from the sixteenth day of July, 1928, at the rate of seven per cent per annum, less any dividends received by plaintiff on any of said stock held by defendant Lilienthal, Bremer & Co.

Parenthetically, it may be observed that there is no dispute as to the technical meaning of a "buyer 60" contract. It is a contract, according to the uncontradicted testimony of Max P. Lilienthal, wherein the purchaser, not wishing to pay outright for the stock, buys it at a price in excess· of the market, and is allowed sixty days' time to pay for the same, payment at the expiration of said sixty days being compulsory.

■ The first point relied on for reversal is that the trial court had no jurisdiction of the action. In support of this contention it is urged that declaratory relief, as provided for in Part 2, Title 14, Chapter 8, of the Code of Civil Procedure, is not applicable to disputed oral contracts and hence was not available to plaintiffs in the present action. The point is without merit. Appellants cite the case of *Transport Oil Co.* v. *Bush*, 114 Cal. App. 152 [1 Pac. (2d) 1060], as containing the proper construction of our declaratory relief statute. A careful examination of this case reveals that the language relied on by appellants is *dicta*. Moreover, in the later case of *Tolle et al.* v. *Struve et al.*, 124 Cal. App. 263 [12 Pac. (2d) 61], the same question is elaborately considered and determined adversely to appellants' position here. In that decision the court declares: "We do not feel called upon to follow appellant into the field of foreign legislation and decision on this point, nor to engage in an analysis of the provisions of our own declaratory relief statute, for the reason that we consider this question to be definitely foreclosed by the decision of our own Supreme Court in *Hess* v. *Country Club Park*, 213 Cal. 613 [2 Pac. (2d) 782]. In that case the plaintiff, who held certain real property under a deed containing certain restrictive provisions, sought and secured declaratory relief adjudging that by reason of the change in condition and character of the neighborhood, it was no longer suitable for residence purposes and hence the restrictions were no longer binding or enforceable. The sole question involved in that proceeding was dependent upon the determination of a question of fact. . . . Unless the Supreme Court sees fit to recede from the position taken in this case, which seems entirely improbable, it can be no objection to a proceeding for declaratory relief that it involves and depends upon the determination of a question of fact."

■ Nor do we believe that the statute, as thus construed, is unconstitutional, as claimed by appellants, in that it deprives litigants of a jury trial. In the present case appellants did not demand a jury trial; moreover, in their separate answers each joined the plaintiff in a prayer for declaratory relief. In this connection, though, it may be pointed out that the constitutionality of the statute was upheld in *Blakeslee* v. *Wilson*, 190 Cal. 479 [213 Pac. 495].

And it may also be noted that section 1061 of the Code of Civil Procedure, also held to be constitutional by the Blakeslee case, *supra,* confers broad jurisdictional powers on the trial court under which it may prevent the abuses of which appellants seem to be apprehensive.

■ Appellants next attack the escrow agreement on the ground that said agreement was a nullity. In this connection it is urged that when Lilienthal, Bremer & Co. received appellants' verbal order for a "buyer 60" contract the brokers should, pursuant to well-established principles of law applicable to such transactions, have informed their client that "buyer 60" contracts were no longer permitted on the floor of the stock exchange; that the brokers failed to do this and, without authority from appellants, negotiated the order on the "street". The method thus adopted by the brokers is vigorously assailed by appellants as being so clearly violative of the verbal order of purchase as to entitle appellants to repudiate the transaction. It is argued that when "buyer 60" contracts were previously permitted on the floor of the exchange custom required the purchasing broker actually to take title for his client, receiving back the stock as a pledge for the unpaid balance. Instead of advising appellants of the real situation, namely, that "buyer 60" contracts had been inhibited by a rule of the stock exchange, the brokers, according to appellants, attempted to consummate the transaction in the form of an executory agreement wherein they actually bought the stock for Herrlein, rather than appellants, and held it for him at all times. In other words, so it is strenuously urged, they acted both as principal and agent in the same transaction. This, it is contended, was a breach of duty ·and, in the absence of a full disclosure of all the circumstances of the transaction, entitled appellants to repudiate. That appellants did attempt to repudiate after the stock had declined in price is not denied. Undoubtedly when a broker, in executing an order, departs from established custom, or rules of practice universally adhered to, he is legally obligated to make full disclosure of his conduct to the client, or else the client may repudiate the entire transaction. (Gilman, Stock Exchange Law, p. 136; Dos Passos on Stock Brokers, p. 376; *Duff* v. *Duff,* 71 Cal. 513 [12 Pac. (2d) 570]; *Marye* v. *Strouse,* 5 Fed. 483 [6 Sawy. 204]; *British American*

*Assur. Co.* v. *Cooper,* 6 Colo. App. 25 [40 Pac. 147].) It is admitted that appellants were not informed of the change in rules of the stock exchange. Assuming, then, that the transaction was irregular in this respect, it still does not appear that appellants suffered any detriment by reason of the irregularity. The evidence clearly reveals that it made little difference to appellants whether the order was filled on the floor of the stock exchange or in the "street". Moreover, the trial court found, in effect, that there had been a ratification of the brokers' acts by the appellants and we cannot say, as a matter of law, that the evidence does not sustain the finding. The escrow agreement, which appellant Fred A. Tocchini admitted he read and signed, was ample notice that he was actually dealing with Herrlein as seller. Since the record discloses that appellant had been a party to similar transactions on previous occasions, it is difficult to believe that he was not fully conversant with every step in the transaction. ■ A second irregularity, which appellants claim warranted a repudiation of the transaction, even as against Herrlein, was the alleged failure of Lilienthal, Bremer & Co. to advise appellants of the refusal by Wells Fargo Bank & Union Trust Company to act as escrow-holder. The evidence discloses that ten days after the trust company had receipted for the property, it decided not to act for the parties any further and thereupon returned the agreement and collateral to Lilienthal, Bremer & Co. Appellants testified that they did not learn of the trust company's action until just before the present suit was commenced. On the other hand, Max P. Lilienthal, a member of the brokerage firm, testified that after the disastrous drop in prices on June 11th, Fred A. Tocchini came to his office and demanded a copy of the escrow agreement; that he signed and handed appellant a copy of said agreement and then advised him that, since the trust company had refused to act any further in the matter, the firm of Lilienthal, Bremer & Co. was holding the agreement and collateral; that appellant voiced no objection to this arrangement. The trial court evidently determined that the appellants not only had been informed of the trust company's action, but, by failure to make objection, had actually given assent to the course pursued by the brokers. It is scarcely necessary to cite the well-known

rule that where the evidence is conflicting it is within the province of the trial court to pass upon its weight and sufficiency. (*Jennings* v. *Weibel*, 204 Cal. 488 [268 Pac. 901]; *Reay* v. *Butler*, 95 Cal. 206 [30 Pac. 208].) We may add that the fact that appellants, after being furnished with a copy of the escrow agreement, deposited additional collateral with Lilienthal, Bremer & Co. to protect the contract, furnishes some evidence that they were willing to proceed with the transaction notwithstanding the fact that Lilienthal, Bremer & Co. had supplanted the trust company as escrow-holder.

Appellants further contend that the escrow agreement, even if not a nullity, was not susceptible to the construction placed upon it by the court below. This contention is based on the assumption that, while the original oral contract was for the outright purchase of the stock, the subsequent escrow agreement constituted a novation, or, at least, a modification thereof. In this connection appellants urge that said escrow agreement, being in writing and signed by the parties, entirely superseded the prior oral stipulations, and that the agreement, in its last analysis, was nothing more than an option to purchase. Respondents, on the other hand, while admitting that the instrument was inartificially drawn, suggest that it may be regarded merely as an awkward and ineffectual attempt of the parties to reduce their oral stipulations to writing. The question here arises, What is the legal effect of the written instrument? If the contract between the parties was partly oral and partly written, as suggested by respondents, and which seems to have been the theory of all parties at the trial, since evidence was received, without objection, as to the terms of the oral agreement, then, of course, the writing would stand as against any of the oral stipulations in conflict therewith. (*Standard Box Co.* v. *Mutual Biscuit Co.*, 10 Cal. App. 746 [103 Pac. 938]; *Peterson* v. *Chaix*, 5 Cal. App. 525 [90 Pac. 948].) The trial court, therefore, necessarily concluded that there was no such conflict. It cannot be denied that the escrow agreement was clumsily drawn and that paragraph three thereof lends color to appellants' claim with respect to an option. Then, too, there is no explicit promise on the part of respondent Herrlein to sell, or on the part of the appellant Tocchini to buy. Moreover,

it is admitted by respondents that the provision therein for the payment of $1600 is erroneous, this amount, being Herrlein's profit on the transaction, having been included in the purchase price of $45,657.50. It is manifest, therefore, that the agreement is ambiguous in several particulars. However, it seems not to be so lame with respect to the mutual obligations of the parties as appellants profess to believe. The parties are designated as buyer and seller, the price is named and the property identified. In these circumstances it may be implied that Herrlein agreed to sell and that Tocchini agreed to buy. (*Gregg* v. *McDonald,* 73 Cal. App. 748 [239 Pac. 373]; *DuBrutz* v. *Bank of Visalia,* 4 Cal. App. 201 [87 Pac. 467, 469].) Construing paragraph two with the subject matter preceding it, it would appear that the parties, in addition to all their stipulations, and somewhat apart from them, sought to deal with the contingency of a falling market should it occur before the due date of the obligation. In other words, the gravamen of the provision is that at all times before July 16, 1928, the buyer shall keep on deposit cash or collateral equal to twenty-five per cent of the market value of the securities in escrow. This does not seem an unreasonable precaution for insertion in a sale agreement, as distinguished from an option, when it is remembered that the seller's profit on the transaction had been definitely fixed, while the buyer's pecuniary opportunity was limited only by the gullibility of the speculative public. Taking the entire transaction by its four corners, the trial court concluded that the deposit was intended solely as security for performance by the buyer of the principal obligation. In other words, the trial court found from all the evidence that the escrow agreement was not intended by the parties as a novation or modification of the oral contract.

It may be observed that while counsel on both sides indulge in much speculation and conjecture as to the terms of the transaction, as evidenced by both the oral and the written agreement, appellant Fred A. Tocchini appeared not to have entertained the slightest doubt. He frankly admitted on cross-examination that when he ordered a "buyer 60" contract he knew he would have to take the stock at the expiration of sixty days, and that the only reason he did not do so was because he lacked the necessary

funds. We quote the following excerpt from his testimony: "Q. You say that Mr. O'Connell told you it [the escrow agreement] was a buyer 60 contract for 200 shares? A. Yes, sir. . . . Q. Now, you knew it was a buyer 60 contract, didn't you? A. Yes. . . . Q. And you knew that it meant that you had obligated yourself to purchase 200 shares of Bancitaly stock and to pay for it within 60 days? A. Yes, sir. Q. And with that knowledge you told Mr. O'Connell to go ahead and make this deal for you? A. To buy 200 shares buyer 60. . . . Q. Why didn't you go ahead and take the 200 shares? A. Because I never had the money to pay for it. Q. Is that the only reason you did not do it, because you did not have the money to pay for it? A. Yes, sir. Q. Why did you make a demand upon Lilienthal, Bremer & Co. to return to you the $12,000 for 263 shares of stock? Was it because you did not have the money to pay for the 200 shares? What is your answer? A. Yes, sir."

It thus appears that appellant himself claimed no modification of his oral contract. On the contrary, he reaffirmed it, as it were, and gave the entire transaction a practical construction—a construction consistent with his previous conduct. ■ When a contract requires construction the parties thereto have a right to place such an interpretation upon its terms as they see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions. (*Mitau* v. *Roddan,* 149 Cal. 1 [84 Pac. 145, 6 L. R. A. (N. S.) 275]; *Work* v. *Associated Almond Growers,* 102 Cal. App. 232 [282 Pac. 965].)

It is conceded by respondents that the trial court should not have allowed interest on appellants' deposit of $12,000. The judgment should be modified accordingly, and as so modified is affirmed.

Knight, Acting P. J., and Cashin, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 13, 1933.