# McAuley, Appellant *v.* Chaplin-Fulton Manufacturing Company.

*Patents—Infringement—Automatic water feeder for boilers.*

The Louis B. Fulton Patent No. 662488, dated November 27, 1900, for an improvement in water regulators for boilers, having for its object the automatic control of the feed water supply for a boiler, is a new invention, and not an infringement of the "McAuley-Fulton" patent dated November 12, 1895, No. 549877, for an automatic water feeder, for boilers, the operation of which is controlled by the water in the boiler whereby the appliance is automatically set in operation upon the water in the boiler falling below low-water mark, and stopped when a proper supply of water has been obtained.

Argued March 12, 1907. Appeal, No. 178, Oct. T., 1906, by plaintiff, from decree of C. P. No. 2, Allegheny Co., April Term, 1903, No. 875, on bill in equity in case of Robert G. McAuley v. The Chaplin-Fulton Manufacturing Company, a corporation, and Louis B. Fulton. Before FELL, BROWN, MESTREZAT, POTTER and ELKIN, JJ. Affirmed.

Bill in equity for an injunction.

FRAZER, P. J., filed the following opinion :

The purpose of this bill is to secure an accounting for royalties upon the sale of boiler feeders manufactured and sold by

defendant company under patents in which plaintiff claimed to have an interest. From the bill, answer and proofs we find the following facts:

### FINDING OF FACTS.

1. In generating steam the water in the boiler is constantly varying within certain vertical limits. For the purpose of periodically renewing and providing a supply of water, numerous appliances have been patented, both in this and in foreign countries, for automatically controlling the flow of water into the boiler. These devices are not new to the art, and all are to a greater or lesser extent constructed on the same principle.

2. Plaintiff and the defendant, Louis B. Fulton, are the joint inventors of an automatic water feeder for boilers, the operation of which is controlled by the water in the boiler, whereby the appliance is automatically set in operation upon the water in the boiler falling below low-water mark, and stopped when a proper supply of water has been obtained, the invention being covered by letters patent of the United States, dated November 12, 1885, and numbered 549877, which letters patent were subsequently assigned to the Chaplin-Fulton Manufacturing Company in accordance with an agreement between plaintiff and defendants, dated August 19, 1895.

3. The agreement referred to in the preceding finding provides for the assignment by McAuley and Fulton to the Chaplin-Fulton Manufacturing Company of the letters patent for the boiler feeder when granted. And in consideration therefor the Chaplin-Fulton Manufacturing Company agrees to pay McAuley and Fulton a royalty of $4.00 on each and every boiler feeder made and sold by it. It is further provided that in the event of the Chaplin-Fulton Manufacturing Company discontinuing the manufacture of such feeders for a period of more than twelve months, or failing to pay the royalties provided for within sixty days after the same became due and payable, " the entire right, title and interest in and to said invention and Letters Patent is to revert to the parties of the first part (McAuley and Fulton), and in that event the party of the second part (the Chaplin-Fulton Mfg. Co.) agrees to reconvey to said parties of the first part all of said right, title

and interest." And it is further provided in clause five of the agreement as follows: "The parties of the first part agree, jointly and severally, to assign to the party of the second part any and all interest in and to any improvements that they or either of them may at any time make on said invention, the same to be included within the terms of this agreement."

4. Subsequent to the granting of the letters patent above referred to, the Chaplin-Fulton Manufacturing Company began the manufacture of boiler feeders in accordance with such letters patent and continued to do so until March, 1901, about 123 feeders in all being manufactured and sold by defendant company, at an average price of $100 each, upon which plaintiff is entitled to royalties.

5. On November 6, 1897, Louis B. Fulton, one of the defendants, filed his application for letters patent for an improvement in water regulators for boilers, having for its object the automatic control of the feed water supply to a boiler, and received from the United States government letters patent, dated November 27, 1900, and numbered 662488, which letters patent were duly assigned by him to defendant company.

6. Defendant company, since such assignment to it by Louis B. Fulton, has been engaged in the manufacture and sale of feed water regulators under the letters patent assigned to it by him, and is still engaged in manufacturing and selling the same. The water regulators manufactured under the patent of Louis B. Fulton are less complicated than those manufactured under the patent of McAuley and Fulton, and are much cheaper, the average price for which the same are sold being about $75.00 each. Under these letters patent a large number of feeders have been manufactured and sold and are now in use throughout the country.

7. The McAuley-Fulton invention provides an automatic feeder, the operation of which is controlled by the water in the boiler, whereby it will be automatically set in motion as soon as the water in the boiler falls below the low-water mark and stops when the proper supply has been obtained. In the operation of making steam and the necessary periodical renewal of the water in the boiler, the water level is constantly varying within certain prescribed vertical limits. The surface of the water in the boiler being turbulent and foaming, to

secure a quiet water level, connection is made with a water column, located outside the boiler, the water column being connected below with the water in the boiler, and above with the steam therein. The water supply to the boiler is effected through an intermittently operating injector or pump or other flow device controlled by the machine of the patent. The machine is designed to operate valves which control a steam supply and exhaust to and from the flow device, so that when the water of the boiler falls to the low level the flow device will operate, and when the water in the boiler rises to the high level the flow device will stop operating. This valve mechanism is actuated by a pivoted tilting lever arranged to make striking or abutting contact with the projecting valve stem.

The pivoted lever is counterweighted at one end and is provided at the other end with a water-actuated body, the weight of which is variable owing to the presence or absence of water, at high or low level. The water-actuated body is a hollow sphere and communicates through the hollow arm of the lever which supports it, with a tube which leads down to the low-water level in the water column. When the bottom of this tube is uncovered by the falling water in the column, steam forces the water out of the hollow water-actuated sphere, thus decreasing its weight so that the counterweight at the other end will tilt the lever and actuate the valve to set the water flow device into operation. When the bottom of the tube is covered by the rising water in the column, steam in the tube and hollow sphere condenses, causing a partial vacuum, and the steam pressure in the upper part of the water column forces water through and around the tube and into the sphere, increasing its weight and overbalancing the counterweight at the opposite end, causing it to tilt in the opposite direction to effect reverse operation of the valve mechanism, by which the water flow device is stopped. To facilitate quick filling and emptying of the water-actuated sphere, the hollow arm of the lever communicates downwardly with a partitioned chamber in the water column, the water being always subject to the same conditions of level and steam pressure existing in the water column and boiler. To facilitate free exhaust of steam from the water flow device, a secondary relief valve is ar-

ranged at the other side of the lever bearing and is actuated by the tilting lever alternately with the pressure valve. To ensure quick and prompt operation of emptying the water-actuated sphere, it is located at a considerable height above the normal water level in the water column and boiler.

8. In the Fulton invention a casing having an interior chamber is mounted on top of a water column and connects at its bottom with the latter, at a point beneath the water level therein, through a pipe, and at its top through another pipe which opens into the column at what is normally the level of the water in the boiler. Within the vessel is located a displacement body, which may be composed of a block of wood or any other suitable material. This displacement body is mounted on the end of a lever which is fulcrumed on the lateral extension of a vessel, and the outer arm of such lever is provided with a counterbalancing weight. To the upper portion of this vessel is secured the casing of a valve which is unseated when the vessel is filled with water, being held from its seat by steam pressure entering the casing through a pipe. Steam so entering the casing will pass through the pipe to and above the diaphragm of the pressure or controlling valve, which latter is unseated when the pressure is cut off through a pipe by the seating of another valve, such controlling valve being opened by pressure against its under side. When the water in the boiler lowers beneath the end of the pipe which extends into the boiler, steam will pass through such pipe into the upper part of the casing, causing the water therein to flow back to the boiler or water column through a pipe, the displacement body in its descent serving to aid the outflow of the water from the casing. Thereupon the fingers of a lever, acting on the extension, will force a valve to its seat so as to cut off the admission of steam pressure, allowing a valve to be unseated by the combined action of pressure against its under side and a spring. Thereupon water will be supplied to the boiler and when the proper quantity has been obtained the lower end of the pipe which extends into the boiler will be submerged, thereby entrapping the steam in the chamber, and such steam being condensed, water will rise in the casing, and the impetus thereof, together with the agency of the counterbalancing weight, will cause the elevation of the dis-

placement body, and consequently the tilting of the lever. The pressure of the finger being relieved from the extension, a valve will be automatically unseated by the steam pressure, allowing the latter to pass from the casing through a pipe to the diaphragm of a valve, effecting the seating of the latter, and the cutting off of steam to the injector and stopping the flow of water into the boiler.

9. While the two machines perform the same duty, they are dissimilar in appearance and materially different in construction and operation. In the Fulton device the lever is operated by the presence and absence of water, not within, but at the outside of the operating device, whereas, in the McAuley-Fulton invention and all previous structures of the kind called to our attention, the lever is operated by the presence and absence of water introduced into a hollow shell or body forming part of the lever or mounted on one end thereof, the water being emptied by the introduction of steam into such hollow body or enlarged end of a pipe leading directly to the latter. In all constructions previous to the Fulton device the only agency for affecting the tilting of the lever was the supplying and discharging of water into the lever itself. In the Fulton appliance, a body suspended from a solid lever and located in a stationary vessel into which water is alternately supplied and emptied, is employed as the means of putting the appliance into operation, the operation of the Fulton feeder being the reverse of the McAuley-Fulton device.

10. While the McAuley-Fulton device and the Fulton device are quite dissimilar in appearance, construction and arrangement, both are operated by the same force differently applied, and both accomplish the same purpose.

11. In accordance with the terms of the contract of August 19, 1895, defendant company bestowed good workmanship on the McAuley-Fulton device manufactured by it, and in good faith endeavored to introduce the invention into general use and promote its sale, and no feeders were manufactured by it in accordance with the Fulton letters patent until there was no longer any sale for the McAuley-Fulton device.

12. Defendant company at the trial tendered complainant and Louis B. Fulton a reassignment of the McAuley-Fulton patent as provided for in the agreement of August 19, 1895.

## CONCLUSIONS OF LAW.

The sole question here is whether the Fulton machine is a new invention or an improvement to the McAuley-Fulton machine. If the former, this bill must be dismissed; if the latter, plaintiff is entitled to an accounting. Robinson on Patents, sec. 210, defines an improvement to be "an addition to or alteration in some existing means, which increases its efficiency without destroying its identity," and in section 213, "But inasmuch as no improvement can subsist without an original on which to rest, this development must always leave the essence of the original invention unimpaired. Whenever, in extending the efficiency of an idea of means, the line which separates that means from every other is crossed, through any change in its essential characteristics, identity is lost, the idea of the original invention is excluded, and the result of the inventive act becomes a new and substantive invention," and again in section 215, "If the changes indicate the introduction in the idea of means of a different force, a different object, or a different mode of application, it is more than a change of form, more even than an improvement, it is a separate invention." In determining what is and what is not an improvement, it seems to be the policy of the courts in passing upon contracts to assign improvements to construe such contracts so as to cover only improvements in the particular patent or machine which forms the immediate subject-matter of the assignment. In Independent Electric Co. v. Jeffrey Mfg. Co., 76 Fed. Repr. 981, the court construed a contract to assign improvements, much more comprehensive in its terms than the one before us, to include only improvements upon the particular machine secured by the patent, and said, "To hold that the assignment in question would pass all of Leckner's future mining machine patents, would, as counsel for complainant suggests, be equivalent to holding that these two assignments constituted, in fact, a mortgage on Leckner's brain, to bind all his future products, which is exactly the thing objected to by the court in Mfg. Co. v. Gill, 32 Fed. Repr. 697. In that case, Justice BRADLEY made it clear that under the rule in Littlefield v. Perry, 88 U. S. 205, only improvements on the particular machine secured by the patent would pass by an assignment of a patent with future improvements." Other cases to the same effect

might be cited. While the McAuley-Fulton machine and the Fulton machine are intended to perform the same duty, that fact alone does not make the latter device merely an improvement on the former. These devices are constructed upon entirely different lines; they are dissimilar in appearance, and in the Fulton machine the force putting the device into operation is applied in a manner different from all previous constructions of the kind. In machines constructed previous to the Fulton device, the lever was operated by the presence or absence of water on the outside and not within. In the construction of his machine, Mr. Fulton ignored this idea and was the first inventor to introduce into feed water regulators the principle of employing a body suspended from a solid lever and located in a stationary vessel into which water is alternately supplied and emptied, the displacement body having no interior communication and its own weight being always the same. In the McAuley-Fulton invention there is a lever, one arm of which is hollow, carrying a sphere at its outer end, which sphere communicates with the interior of the boiler, the emptying of water being effected by the introduction of steam through a pipe which passes through the hollow arm and opens into the sphere. In the Fulton invention the lever has no hollow arm, the hollow sphere being connected through a hollow arm with the interior of the boiler and no steam pipe passing through an arm of the lever into the sphere. The water never enters the displacement body or the float. The latter lowers by its own weight. When water is passing through the chamber it is elevated by the buoyancy of the water, coupled with condensation of steam under the chamber wherein it is located. The lever cannot, under any interpretation of the scope of the invention of McAuley and Fulton, be construed as a McAuley-Fulton lever or as operating on the same principle. If the water were introduced into and discharged from the displacement body or float, and the latter connected through the hollow arm of the lever with the interior of the boiler it might be an equivalent, but instead, the lever and displacement body of the Fulton invention are so radically different from the McAuley-Fulton invention as, in our opinion, to constitute a new invention in the art, operating on a different principle and not in any way dependent upon the employment of a hollow lever having a

sphere at one end connecting with the interior of the boiler. To hold the Fulton invention to be an equivalent of the McAuley-Fulton machine would, in our opinion, be contrary to the principle laid down in Electric Co. v. Jeffrey Mfg. Co. and Mfg. Co. v. Gill, above referred to.

After considering all the evidence in the case, together with the construction and operation of the two machines, we are of opinion that the Fulton machine is a new invention and not an improvement upon the McAuley-Fulton device; that the " essential characteristics " of the former are different from those of the latter; that the Fulton device could not be applied to the McAuley-Fulton appliance " without destroying its identity." We, therefore, conclude that plaintiff is not entitled to an accounting on account of machines manufactured and sold under the Fulton device. The bill is, therefore, dismissed at his costs.

Let a decree be drawn accordingly.

*Error assigned* was decree dismissing the bill.

*Charles M. Clarke*, with him *W. H. McClung*, for appellant.

*J. Nota McGill*, with him *J. S. Ferguson*, for appellees.

Per Curiam, April 1, 1907:

The decree dismissing the bill is affirmed at the cost of the appellant on the findings of fact and the conclusions of law of the learned judge of the common pleas.