Filed 9/8/16  Goldmex v. Glendale I Mall Assoc. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| GOLDMEX, INC.,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>GLENDALE I MALL ASSOCIATES, LLC et al.,<br><br>  Defendants and Appellants. | B265076<br><br>(Los Angeles County<br>Super. Ct. No. BC490458) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly E. Kendig, Judge.  Affirmed.

The ByrneLaw Office, John P. Byrne and Sherin Hackman, for Defendants and Appellants.

Ablon, Lewis, Bass & Gale, Jerald E. Gale and Lawrence J. Poteet, for Plaintiff and Respondent.

Glendale I Mall Associates, LLC (defendant)[1] leased space in the Glendale Galleria food court to Goldmex, Inc. (plaintiff), which operated a La Salsa Fresh Mexican Grill pursuant to a franchise agreement. The 10-year lease entitled plaintiff to a rent reduction if its "Net Sales" fell below $800,000 for a continuous 12-month period. Midway through the lease, plaintiff notified defendant it was exercising its right to pay reduced rent because its Net Sales failed to meet the $800,000 threshold when plaintiff subtracted the advertising and license fees it paid to its franchisor. Plaintiff had not previously subtracted such fees in calculating its Net Sales, and defendant maintained the lease did not allow plaintiff to do so. Litigation between the parties ensued, and the trial court entered judgment in plaintiff's favor after a bench trial. We consider whether the court correctly interpreted the lease to permit plaintiff to deduct the franchise fees.

## I. BACKGROUND

### A. *The Lease Agreement*

Plaintiff began operating its restaurant in the Glendale Galleria in 1989, pursuant to a franchise agreement with La Salsa Franchise, Inc. (La Salsa). The agreement required plaintiff to pay La Salsa a fixed percentage of its gross sales at regular intervals, specifically, a five percent "royalty fee" for use of La Salsa's operational system and proprietary marks plus a one percent "advertising fee" (hereafter, the "franchise fees"). Defendant's affiliate, General Growth Properties (General Growth), owned and managed the Glendale Galleria as well as another local mall, the Northridge Fashion Center (Northridge), in which plaintiff's affiliate, Goldmex LLC, also operated a La Salsa Fresh Mexican Grill pursuant to a franchise agreement.

In the summer of 2004, David Grossman (Grossman), General Growth's leasing agent and a representative of defendant, began negotiations with plaintiff's president, Andy Goldman (Goldman), to renew plaintiff's lease in the Glendale Galleria. That fall,

---

[1] In 2012, Glendale I Mall Associates, LLC was converted to a limited partnership, Glendale I Mall Associates, LP, which the trial court added as a defendant in these proceedings. For convenience, we refer to both parties as the "defendant."

the parties signed a new lease for a 10-year term that would run through September 2014. The lease agreement in the record appears to be a form document with deletions to standard provisions represented by strikeouts and additions set forth in a different font.

Plaintiff agreed in the lease to pay monthly rent based on a "Minimum Annual Rental" amount plus "additional rent" for plaintiff's share of utilities, taxes, and other joint expenses. Plaintiff's rent was also subject to an additional increase or reduction if its "Net Sales" exceeded or fell below certain thresholds. Most relevant here, if Net Sales fell below a specified amount, plaintiff became eligible to pay reduced rent under the terms of Article 1.35. Article 1.35 of the agreement provides (emphasis added):

> Commencing on October 1, 2008, *in the event Tenant's Net Sales drop below $800,000.00 for an entire 12 month period, then Tenant's sole and exclusive remedy shall be the right to pay Landlord in lieu of Minimum Annual Rental and all items of additional rental a sum equivalent to 10% of Net Sales for each and every month throughout the remainder of the Term*, payable monthly in arrears, within 10 days following the end of each calendar month. This right shall be exercised upon 30 days prior written notice given to Landlord within 30 days after the expiration of said 12 month period. Notwithstanding the foregoing, in the event Tenant's Net Sales, thereafter for any 12 month period are in excess of $900,000.00 then this Lease shall immediately continue upon all of its original terms and conditions including, but not limited to, the payment of Minimum Annual Rental and all items of additional rent.

A separate provision of the agreement defined the term Net Sales as used in Article 1.35. The definition, as relevant here, included all of the following in the calculation of Net Sales:

> Net Sales shall include (as of the date of the transaction) the entire amount of the sale price of all goods and merchandise sold (including gift and merchandise certificates when redeemed), leased, rented or licensed and the charges for all services and all other receipts in, upon or from any part of the Leased Premises or as a result of Tenant's agreement, if any, to link its website to the Shopping Center's website, whether (wholly or partially) for cash or credit . . . .

3

The definition in Article 5 of the agreement further specified what was to be "deducted or excluded" from the calculation of Net Sales. As most pertinent to the issue raised on appeal, the definition stated:

> The following shall be deducted or excluded, as the case may be, from Net Sales, provided such exclusions are specifically itemized: (a) refunds to customers to the extent that such refunds relate to (i) a prior inclusion of the same transaction or (ii) returns of merchandise purchased from other physical store locations of Tenant; (b) sales, use, excise, retailer's, occupation or similar taxes imposed in a specific amount, or percentage upon, or determined by, the amount of sales; . . . (e) sales not in the ordinary course of Tenant's business, of machinery or equipment which Tenant has the right to remove from the Leased Premises; . . . and (h) *the proceeds of the sale of any franchise to operate the business on the Premises and all fees, charges or charges* [*sic*] *from such franchise.*

The subsection (h) provision, which we have italicized above, was (along with another provision) set forth in a different font than the other text in Article 5, signifying an addition that had been made to the standard form agreement.

Elsewhere in the agreement, plaintiff agreed to remodel its restaurant by September 1, 2007. Plaintiff further agreed that all amendments, modifications, and supplements to the lease would be ineffective unless made in a writing signed by the parties, that defendant had "made no representations, inducements or promises" about the lease apart from those stated in the lease, and that defendant would "not be liable because of[ ] the breach of any representations, inducements or promises not expressly in [the] Lease." Plaintiff signed an affidavit attesting to a similar representation: that no "representative, agent or employee of Landlord made any representations, inducements or promises about the Leased Premises or the entry into the Lease, unless expressly in the Lease" and that plaintiff had "not relied upon any representations, inducements or promises by Landlord's representatives, agents or employees, other than those contained in the Lease."[2]

_____

[2] Goldmex LLC's Northridge lease, which ran from May 2002 through January 2014, was based on the same form as plaintiff's Glendale lease. The Northridge lease

4

In January 2012, Goldman notified Larry Martin (Martin), the General Manager of the Glendale Galleria, that plaintiff was exercising its right to pay reduced rent under Article 1.35 because its Net Sales for the period July 1, 2010, through June 30, 2011, totaled $788,566. Defendant denied plaintiff's request because the records plaintiff had previously supplied to defendant showed sales of $838,905 for the period at issue. After plaintiff provided new sales numbers, defendant audited plaintiff's records and discovered the discrepancy: when plaintiff recalculated its Net Sales, it subtracted the six percent in franchise fees it paid to La Salsa, which it had not done before. Defendant's auditor concluded that without this deduction, plaintiff's Net Sales would have been "approximately $848,465 and $844,627" for the years 2011 and 2010, respectively.[3]

Defendant informed plaintiff it disagreed plaintiff could deduct fees paid to La Salsa from its Net Sales. In defendant's view, plaintiff's "original reporting" accurately showed sales above the $800,000 threshold, and if plaintiff did not immediately pay past due rent, plaintiff would be in default. Goldman (for plaintiff) and Martin (for defendant) thereafter discussed resolving the parties' dispute by negotiating an extension to the existing lease that would provide new terms regarding rent and other issues, but they failed to reach an agreement. Defendant again requested that plaintiff pay the non-reduced rent due, which plaintiff did under protest.

B.      *Procedural History*

1.      *Pretrial proceedings*

Plaintiff sued defendant in August 2012 for breach of contract and declaratory relief.[4] Plaintiff sought a judicial determination that Article 5 of the lease allowed it to

---

included the identical (apart from one immaterial word) Article 5 Net Sales provision as the Glendale lease, but it did not include Article 1.35 or any comparable provision allowing the tenant to pay reduced rent if its Net Sales fell below a certain threshold.

[3]      Plaintiff admitted that but for subtracting the franchise fees it paid to La Salsa, its Net Sales had not dropped below $800,000 for an entire 12-month period.

exclude from Net Sales the franchise fees it paid to La Salsa and that Article 1.35 entitled it to pay reduced rent with those fees deducted.

Defendant moved for summary judgment, contending that Article 5(h) (the provision authorizing plaintiff to deduct or exclude from Net Sales "the proceeds of the sale of any franchise to operate the business on the Premises and all fees, charge[ ] or charges from such franchise") could not reasonably be interpreted to allow plaintiff to exclude its payment of franchise fees to La Salsa. Defendant asserted Article 5 could only be read to exclude certain "*sales* transacted *by* Goldmex" after October 2008 and that subsection (h), consistent with the other excludable items in Article 5, necessarily referred to proceeds plaintiff might receive if it, not its franchisor, sold a franchise after October 2008. Subsection (h) could not be interpreted, defendant contended, to apply to plaintiff's 1989 purchase of a franchise and the expenses associated with that purchase.

While conceding the lease was fully integrated, plaintiff opposed summary judgment on the grounds that (1) during lease negotiations, Grossman assured Goldman plaintiff could exclude from Net Sales the franchise fees it paid to La Salsa, (2) Article 5(h) was specifically negotiated and added to the lease in order to effectuate that intent, and (3) plaintiff's interpretation of 5(h) was consistent with the text of Article 5, which did not refer to proceeds of a franchise sold "by" plaintiff.

The trial court denied defendant's motion for summary judgment, reasoning that under *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343 (*Wolf*), it could consider plaintiff's extrinsic evidence of the parties' intent when negotiating the lease and that such evidence revealed a "latent ambiguity" in Article 5(h) that rendered the provision "reasonably susceptible of the meaning advanced by [plaintiff]." The court ruled such evidence precluded it from rendering a decision as a matter of law. Defendant petitioned this court for a writ of mandate, which we summarily denied, finding "a triable controversy as to whether the Lease allows plaintiff to deduct its franchise fees from its

---

[4] Plaintiff later withdrew a cause of action for an accounting that was also included in its complaint. (2RT 1214-1215)

net sales for calculation of its annual rent to petitioner. (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1350-1352.[)]"

Prior to trial, defendant moved in limine to exclude Goldman's anticipated testimony that Grossman agreed plaintiff could deduct or exclude franchise fees paid to La Salsa when calculating Net Sales and such agreement was manifested by the terms of Article 5(h). Defendant argued such testimony was inadmissible parol evidence because it contradicted the text of the lease. The court denied defendant's motion, opining that it was a "motion for reconsideration" of the court's previous summary judgment ruling as opposed to a motion in limine and that our summary denial of defendant's writ petition "means it's law of the case." The court elaborated: "[It] doesn't mean we have a final decision on it. [It] just means that this evidence comes in. . . . [¶] And, you know, whether the evidence is going to support or not support or how it's going to come out has yet to be decided. . . . [¶] It's law in the case that this evidence can come in because that issue was taken up and it was decided by them and they sit above me."

### 2. *Trial*

The court held a bench trial over three days in November 2014. Goldman was plaintiff's principal witness.

According to Goldman, even though plaintiff's Glendale lease did not expire until 2007 or 2008, defendant sought to negotiate a new lease in 2004 because a competing mall was being developed nearby and defendant worried existing tenants would "jump ship." As part of the deal, defendant wanted plaintiff to remodel its restaurant, which plaintiff would agree to do only if it was assured "some type of a safety net that would allow [it] to survive if [it was] going to spend $100,000, $200,000 on redressing [its] restaurant." Plaintiff determined that its "break even point" was "$800,000 in sales," annually, which it then surpassed by $150,000 to $200,000, and the parties agreed the deadline to remodel and the availability of the safety net would occur "in concert" in 2008. If plaintiff's sales dropped below $800,000 for any 12-month period beginning in

7

September 2007, when the remodel was required to be completed, its total rent would be equal to 10 percent of sales, which was less than plaintiff's existing obligation.

Goldman also testified Grossman had agreed—with respect to both the Northridge and Glendale leases—that plaintiff (or its affiliate Goldmex LLC) would have the right to subtract its franchise fees to La Salsa when calculating Net Sales. Goldman said he had asked Grossman what specific provision in the Glendale lease allowed him to deduct franchise fees, and Grossman had told him "5-H." Goldman further explained plaintiff was at a disadvantage because "most, if not all" of the other food court restaurants were "company owned or . . . private," and plaintiff's franchise fees were therefore an "additional expense" other tenants did not have. Goldman likened such fees to sales taxes—funds plaintiff collected for another party to which it had no rights. The Northridge lease required plaintiff to pay additional rent, that is, a percentage of sales, if sales exceeded $900,000, but the Northridge lease did not allow plaintiff to pay less rent, as in the Glendale lease, if sales fell below a certain amount. Goldman told his bookkeeper, therefore, to deduct franchise fees from sales at the Northridge restaurant only if such sales exceeded $900,000. With respect to the Glendale restaurant, however, Goldman told the bookkeeper to deduct franchise fees whenever gross sales "reached both the bottom and the top," meaning sales that were "overages" or "were below the safety net."

Goldman also addressed why franchise fees had not previously been deducted from Net Sales under the Glendale lease: he explained his bookkeeper had failed to deduct the fees contrary to Goldman's instructions and without his knowledge. Goldman additionally described how it was that he came to discover franchise fees were not being deducted. His Glendale restaurant was suffering in late 2011 because his sales "stunk" and his rent had gone up pursuant to a predetermined increase set forth in the lease. Because Goldman did not understand why his business was struggling, Goldman asked his accountant to review the restaurant's expenses. After doing so, the accountant informed Goldman plaintiff was not breaking even because it had not been deducting its franchise fees; if it did so, sales would be less than $800,000 annually and plaintiff would

8

be entitled to lower rent. Once Goldman recalculated Net Sales excluding franchise fees, he learned he could have exercised his right to reduced rent beginning in July 2011. Thus, in late 2011 or early 2012, Goldman told Martin that plaintiff had been over-reporting its sales because it had failed to deduct its franchise fees as set forth in the lease.

James Dix, a regional director of restaurants for General Growth with 35 years experience in the shopping center industry, testified for defendant. Dix negotiated restaurant transactions for General Growth but had not participated in negotiating plaintiff's lease. He testified that the term "net sales" has a specific meaning in the shopping center business: it described all sources of income the retailer received minus "[t]hings like excise taxes, sales taxes, taxes to the government, you know, employee sales up-capped at a certain amount of money, exchanges, refunds, things of that sort." Dix said the word "net" in the term "net sales" did not refer to expenses. Dix was not asked to explain what he meant by the term "expenses."

Grossman, who had actually negotiated the lease with Goldman, was identified as a defense witness prior to trial. Defendant did not call Grossman to testify, however.

The parties submitted their closing arguments in writing and later appeared in court to argue the matter further. Plaintiff contended Goldman's uncontroverted testimony established the parties mutually intended to allow plaintiff to exclude its franchise fees to La Salsa when calculating Net Sales and that such intent was consistent with the language of the lease when viewed as whole. Plaintiff asserted that in order for defendant to rebut Goldman's testimony, it would have had to offer testimony from Grossman. Plaintiff also argued that its failure to exclude franchise fees from Net Sales earlier during the lease term did not estop it from doing so later because the lease did not require plaintiff to exclude such fees, Goldman was unaware before late 2011 that it had not been excluding such fees, and defendant was not injured by plaintiff's failure to do so.

Defendant argued Article 5(h) could not be interpreted to allow plaintiff to deduct franchise fees to La Salsa because (1) plaintiff had included such fees when it initially set

9

the $800,000 "break even" amount and it would therefore be "double dipping" to then remove such fees from Net Sales;[5] (2) plaintiff's failure (presumably known to its bookkeeper, who did not testify at trial) to deduct such fees for seven years under the Glendale lease and for more than 10 years under the Northridge lease established a course of conduct indicating the parties never intended that such fees would be deductible; and (3) both the language of Article 5 and the industry usage of "net sales" indicated 5(h) applied only to items of income *received* from sales by plaintiff, not expenses plaintiff paid out.

The trial court returned a verdict for plaintiff on both the declaratory judgment and breach of contract causes of action. In its statement of decision, the court described Goldman as "a highly credible witness for plaintiff" who was "the only percipient witness for either party" to testify as to "what transpired in the negotiations, revisions, and signing of the Lease." In contrast, "[d]efendant did not present any evidence to rebut Mr. Goldman's testimony concerning the Lease negotiations or the representations made

---

[5]     Defendant's argument that plaintiff accounted for its franchise fee expense when initially calculating the $800,000 break even number was based on the following testimony of Goldman during defendant's cross-examination:

> Q.     But you say you discussed one particular expense, your most predictable, your most reliable expense, the fee for the La Salsa name, with Mr. Grossman?
> A.     Yeah . . . .
> Q.     You raised this particular expense in conversations with Mr. Grossman to explain you had this particular expense?
> A.     Yes.
> Q.     And you explained that you wanted to include it in your safety net; correct?
> A.     Yes.
> Q.     Okay. And Mr. Grossman had no objection to that concept?
> A.     Eventually, yes. Yes, he did not. It was—negotiations went smoothly, yes.
> Q.     Okay. And he actually, according to your testimony, explicitly agreed to it. Is that what your testimony is?
> A.     He agreed to it, yes.

10

to Mr. Goldman by Mr. Grossman." Goldman's "uncontradicted" testimony established the parties mutually intended to allow plaintiff to deduct its franchise fees to La Salsa when calculating Net Sales under the lease. Defense witness Dix testified only to a "generalized opinion" on the meaning of "net sales" and his testimony "did not controvert or overcome in any way" Goldman's testimony.[6] The court declared Article 5 of the lease entitled plaintiff to deduct the franchise fees it paid to La Salsa when calculating Net Sales and Article 1.35 entitled it to pay reduced rent if the calculation fell below the applicable threshold. The court found plaintiff had established its Net Sales fell below the $800,000 threshold so as to trigger its right to pay reduced rent, and it awarded plaintiff $246,171.74 in damages plus prejudgment interest for breach of contract.

Defendant moved for a new trial, which the court denied on the ground that defendant merely sought to "reargue[ ] the merits of [the] case." The court explained that after reviewing "all of the briefs and all of the elements of this case, reflect[ing] on the Court's ruling, [and] reweigh[ing] the evidence," it found plaintiff's interpretation of Article 5(h) "more reasonable" than defendant's interpretation under the circumstances. In response to defendant's argument that the trial court erroneously treated our summary denial of its writ petition as "law of the case," the court stated it "never treated any [issue] as law of the case because [it] didn't treat anything as res judicata." Its "use of the term 'law of the case' during the trial . . . was a misnomer, and a shorthand reference to the concept of deference to the Court of Appeal," which "reaffirm[ed]" *Wolf*, a case that required the trial court to consider extrinsic evidence.

---

[6]     The court noted defendant never explained why it did not produce Grossman as a witness despite apparently having the power to do so, citing Evidence Code section 412 ("[i]f weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust").

## II. DISCUSSION

The answer to the question of whether the trial court correctly interpreted the lease agreement primarily hinges on whether the agreement's Net Sales definition is ambiguous, i.e., whether it is reasonably susceptible to an interpretation that would permit deducting or excluding franchise fees. We conclude that it is, and we reject defendant's argument that such a conclusion does not accord sufficient weight to the plain text of Article 5. We further hold substantial evidence supports the trial court's determination, after weighing extrinsic evidence, that the parties intended to permit plaintiff to deduct franchise fees under the lease agreement.

### A.      *Principles of Contract Interpretation and Standard of Review*

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) When parties settle an agreement in writing, their intent "is to be ascertained from the writing alone, if possible . . . ." (Civ. Code, § 1639.) However, the fact that the language of an agreement might at first blush appear clear "does not preclude the possibility that the parties chose the language of the instrument to express different terms." (*Pacific Gas and Electric Co. v. G. W. Thomas Drayage & Rigging Co., Inc.* (1968) 69 Cal.2d 33, 39 (*Pacific Gas*); accord, *Wolf, supra*, 114 Cal.App.4th at p.1351 ["Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible"].)

Interpreting a contract is therefore a two-step process. In the first step, a court provisionally receives, without admitting, all credible evidence relevant to determining whether the contract language is "reasonably susceptible" to a party's proposed interpretation. (*Pacific Gas*, *supra*, 69 Cal.2d at pp. 37, 39-40 & fn. 7; *Wolf, supra*, 114 Cal.App.4th at p. 1351.) While "extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited

12

purpose." (*Pacific Gas*, *supra*, at p. 39.) The court may consider "the circumstances surrounding the making of the agreement [citations], including the object, nature and subject matter of the writing [citations], and the preliminary negotiations between the parties." (*Universal Sales Corporation, Ltd. v. California Press Manufacturing Co.* (1942) 20 Cal.2d 751, 761 (*Universal Sales*); see also Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"].) "The court may also look to the acts of the parties that show what they believed the contract to mean. [Citation.]" (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 712; see also *Universal Sales*, *supra*, at p. 761 ["the acts and conduct of the parties with knowledge of [the contract's] terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court"].) The court's determination that a contract is susceptible to multiple interpretations is a question of law, subject to de novo review on appeal. (*Wolf*, *supra*, at p. 1351.)

In step two, assuming the language of the contract is reasonably susceptible to two different readings, a court resolves the ambiguity by interpreting the contract (*Wolf*, *supra*, 114 Cal.App.4th at p. 1351), and the court may admit "extrinsic evidence relevant to prove either of such meanings" (*Pacific Gas*, *supra*, 69 Cal.2d at p. 40). If a trial court interprets a contract without consideration of extrinsic evidence, or if the extrinsic evidence it considers is not conflicting, its determination is a question of law that we review independently. (*Wolf*, *supra*, at p. 1351; see also *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866, fn. 2 (*Parsons*) [de novo review where undisputed evidence leads to conflicting inferences].) But if the court's resolution of the ambiguity turns on assessing the credibility of extrinsic evidence or otherwise resolving conflicts in the evidence, we review the trial court's decision under the substantial evidence standard of review. (*Parsons*, *supra*, at p. 865; see also *Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813, 852; *Taylor v. Nu Digital Marketing, Inc.* (2016) 245 Cal.App.4th 283, 288; *Wolf*, *supra*, at pp. 1351, 1359.)

Here, the parties agree we must independently consider whether the Glendale lease is reasonably susceptible to more than one interpretation. The parties disagree, however, on what standard of review applies if we believe it is. Defendant argues for the de novo standard, notwithstanding the trial court's consideration of extrinsic evidence, because defendant asserts the evidence was uncontroverted at trial. But that cannot be what defendant means because if it were, defendant fails to appreciate the logical conclusion we would draw. Goldman testified to facts demonstrating the parties intended to permit plaintiff to deduct franchise fees from Net Sales.[7] If defendant truly concedes that testimony is uncontroverted, that would be the end of its case on appeal regardless of what standard of review applies. The "the mutual intention of the parties as it existed at the time of contracting" (Civ. Code, § 1636) would be clear, there would be no conflicting inference we could draw from that testimony, and we would simply affirm.

Instead, portions of defendant's briefs separate from their discussion of the standard of review do attempt to identify conflicts in the extrinsic evidence. Defendant points in particular to the testimony of defense witness Dix and plaintiff's "course of performance" (i.e., its failure to deduct franchise fees in prior years). The trial court weighed this evidence, expressly finding Goldman was a credible witness, and ultimately concluded the lease agreement was best interpreted to permit plaintiff to deduct franchise fees. The substantial evidence standard of review applies to this sort of step-two determination in a contract interpretation case. (See, e.g., *Wolf*, *supra*, 11 Cal.App.4th at pp. 1359-1360 [extrinsic evidence showing parties' "competing interpretations" of their agreement were issues of fact, as were the parties' "objectively reasonable expectations" about the meaning of a particular lease term during negotiations]; see also *Parsons*, *supra*, 62 Cal.2d at p. 865 ["It is therefore solely a judicial function to interpret a written instrument *unless the interpretation turns upon the credibility of extrinsic evidence*"],

---

[7]     "Q. . . . In your conversation with Mr. Grossman before you signed the lease, did Mr. Grossman specifically point you to a particular provision in the lease that he said would allow you to deduct your franchise fees? [¶] A. Yes. . . . [¶] Q. . . . [W]hat provision was that? [¶] [Goldman]: Provision 5-H."

14

italics added; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 847 ["Where, as here, the interpretation of a contract turns on the credibility of conflicting extrinsic evidence, the trier of fact must determine the meaning of language in the contract. . . . If substantial evidence supports that interpretation, we will not overturn it on appeal"] (*Benach*).)

> B. *Plaintiff Proved It Was Entitled to Exclude Its Franchise Fees from Net Sales and Therefore to Pay Reduced Rent*
>> 1. *Article 5(h) is reasonably susceptible to plaintiff's interpretation*

Article 5(h)—which allows plaintiff to exclude or deduct from its Net Sales "the proceeds of the sale of any franchise to operate the business on the Premises and all fees, charge[ ] or charges from such franchise"—is reasonably susceptible to the interpretation advanced by defendant, but also to the interpretation advanced by plaintiff. Put more succinctly, it's ambiguous. (*Benach*, *supra*, 149 Cal.App.4th at p. 847 ["Ambiguity exists when a contractual provision is susceptible of two or more reasonable constructions"].)

> *a. textual analysis*

Considering first just the plain text of the provision, it is ambiguous because of what is missing: an actor, and perhaps also a verb. As stated, the provision is made up almost entirely of nouns and descriptive prepositional phrases (e.g., "proceeds from the sale of any franchise"). The agreement does not specify *who* is receiving or paying the fees, charges, or proceeds associated with a franchise operating in the Glendale Galleria food court, and the absence of this key information leaves the meaning susceptible to differing interpretations. Defendant contends Article 5(h) only permits deduction of proceeds or associated fees and charges from a franchise sold *by plaintiff*, and that is reasonable looking at the text alone. But there is no logical or syntactical reason why the provision cannot also reasonably be read to permit deduction of proceeds or fees and

15

charges from a franchise sold *to plaintiff*.  The reasonableness of either reading is reinforced by Article 5(h)'s use of the term "any" before "franchise."

Moreover, reading subsection (h) along with the other subsections in Article 5 makes plaintiff's interpretation of the provision appear all the more reasonable.  The noscitur a sociis interpretive canon is often used to discern the meaning of a word or phrase in a longer listing of items by looking to the neighboring words or phrases and interpreting the terms similarly.  (*McDonnell v. United States* (2016) ___ U.S. ___ [136 S.Ct. 2355, 2368] ["Under the familiar interpretive canon noscitur a sociis, 'a word is known by the company it keeps'"]; *Blue Shield of California Life & Health Ins. Co. v. Superior Court* (2011) 192 Cal.App.4th 727, 740 [discussing canon in interpreting a phrase in an insurance policy].)  Here, subsection (b) of the same Article 5 Net Sales definition permits plaintiff to deduct "sales, use, excise, retailer's, occupation or similar taxes imposed in a specific amount, or percentage upon, or determined by, the amount of sales."  These deductible taxes resemble the franchise fees plaintiff sought to deduct; both are payments plaintiff must make on income received, calculated as a percentage of its sales.  While subsection (b) by no means conclusively resolves the meaning of the franchise fees provision in subsection (h), the parties' agreement to permit deduction of amounts similar to the franchise fees plaintiff paid is further textual evidence that the Net Sales definition does not unambiguously preclude plaintiff from deducting those fees in its sales calculations.[8]

Article 21 of the lease agreement, concerning assignment and ownership of the lease rights, is additional textual evidence supporting the reasonableness of plaintiff's interpretation of Article 5(h).  Under that provision, plaintiff could not "transfer, assign,

---

[8]     Defendant contends on appeal that the taxes referenced in Article 5(b) are dissimilar to franchise fees because merchants generally include such taxes in the price of a product whereas they do not for franchise fees.  Of course, that is not a textual argument, and there was no extrinsic evidence even provisionally admitted on the custom and practice of merchants concerning the payment of sales taxes.  Indeed, the only supporting authority defendant musters for this assertion is an unconvincing citation to the United States Internal Revenue Service website.

16

sublet, enter into license or concession agreements, change ownership, or hypothecate this Lease" without defendant's prior written approval, unless to "a bona fide merged, consolidated, parent or successor corporation," a or a wholly owned subsidiary or affiliate of plaintiff. This fairly strict limitation on transferring ownership of, or issuing licenses for, plaintiff's interest in the lease creates no tension with the Net Sales exclusion specified in Article 5(h) if that provision is understood to permit deduction of the franchise fees plaintiff paid to a third party. On the other hand, the terms of Article 21 are in tension with defendant's interpretation of Article 5(h)—that it allows plaintiff to deduct fees, charges, or proceeds only for a franchise sold *by plaintiff*—because Article 21 makes it more difficult for plaintiff to do just that, sell a franchise in its Glendale restaurant to a third party. Again, this is not to say Article 21 is dispositive as to the meaning of Article 5(h); rather, it is simply another textual feature that tends to show Article 5(h) is reasonably susceptible to more than one interpretation.

### b. extrinsic evidence

When we provisionally consider the extrinsic evidence offered by the parties in the trial court, it only confirms what we have already concluded: Article 5(h) is ambiguous.

Two preliminary observations are in order before we discuss the evidence. First, that the lease contains an integration clause does not preclude us from considering extrinsic evidence on the question of ambiguity. (*Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) 237 Cal.App.4th 1342, 1354-1355.) If we determine the lease is susceptible to plaintiff's interpretation, there is no violation of its integration clause because there is no alteration of the lease terms. (*Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 897.) Second, because we have considered all the evidence offered by the parties and our review at this point of the inquiry is de novo, we have no need to address defendant's contention the trial court erred in purportedly failing to consider certain evidence.

The evidence offered by plaintiff demonstrates Article 5(h) is susceptible to an interpretation that permits deduction of plaintiff's franchise fees. Goldman testified the

17

parties negotiated to allow plaintiff to deduct franchise fees from Net Sales, and he recounted Grossman's statement that Article 5(h) was the provision that would allow plaintiff to do so. Not only that, plaintiff also introduced evidence indicating defendant's own personnel were unsure about how to interpret Article 5(h), and some in fact thought it should be interpreted in the manner plaintiff suggests. For instance, defendant's Director of Tenant Audits was asked to review the lease agreement when defendant was deciding whether to allow plaintiff to deduct franchise fees and he agreed the language in Article 5(h) permitting deduction of fees and charges "from the franchise" meant fees and charges emanating "from" La Salsa to plaintiff. Plaintiff also introduced evidence that Martin (the general manager of the Glendale Galleria) advocated reducing plaintiff's rent in accordance with Article 1.35 as plaintiff requested, although Martin was ultimately overruled by his superiors.

Defendant argues other extrinsic evidence provisionally admitted instead demonstrates the agreement unambiguously requires plaintiff to include, not exclude, franchise fees in its Net Sales figures. One of defendant's arguments, relying on the rent reduction provision in Article 1.35, goes as follows. First premise: the $800,000 sales threshold chosen as the trigger for paying reduced rent was chosen because it was plaintiff's "breakeven" point, i.e., the amount of sales that would cover all of plaintiff's monthly expenses, including franchise fees. Second premise: if plaintiff had excluded the franchise fees it must pay when calculating its "breakeven" point, defendant would have demanded the $800,000 trigger allowing payment of reduced rent be set at a lower amount. Ergo: fixing the reduced rent trigger at $800,000 in Net Sales means the parties cannot have mutually intended to define Net Sales in a manner that would allow plaintiff to deduct the franchise fee payments when calculating its sales figures. Both premises of defendant's argument, however, are faulty.

Defendant's first premise relies on testimony given by Goldman on cross-examination, already reproduced in the margin *ante* at page 10 footnote 5, that is too vague to be persuasive. Goldman's testimony that Grossman eventually agreed plaintiff could include the franchise fees in his "safety net" can be understood, and seems most

18

naturally understood, to mean that Grossman eventually agreed plaintiff could take such fees into consideration—namely, by excluding them—when determining whether the safety net was triggered. Defendant's second premise is faulty because we see no evidence in the record that would support it. Grossman did not testify at trial, and there is no basis to conclude defendant would have demanded a lower reduced rent threshold if plaintiff's franchise fees were not included in the calculation of its "breakeven" point. Moreover, even if both premises were sound, we would still be of the view that the whole of the extrinsic evidence provisionally admitted does not make clear the ambiguous text of Article 5(h).

Defendant additionally relies on what it terms plaintiff's "course of conduct," i.e., the failure to deduct franchise fees from Net Sales in prior years, to argue Article 5(h) is not ambiguous. Goldman explained at trial why plaintiff had not previously deducted franchise fees, but defendant disputes the explanation, arguing it "defies credibility." This is not an argument that calls into question our conclusion, at step one of the interpretive inquiry, that Article 5(h) is ambiguous. Rather, it is an argument suited instead to step two: a claim that the course of conduct evidence should have led the trial court to the opposite conclusion when weighing the extrinsic evidence regarding the meaning of Article 5(h). We accordingly discuss defendant's course of conduct argument in the context of our step two interpretive review, to which we now proceed.

2. *Substantial evidence supports the trial court's interpretation of the lease*

We hold substantial evidence supports the trial court's determination, based on extrinsic evidence, that the contract allows plaintiff to exclude its La Salsa franchise fees from Net Sales. We have already described why the text of the Net Sales definition is amenable to, and perhaps even more supportive of, plaintiff's interpretation that understands the provision to permit deduction of its franchise fees. The extrinsic evidence, which was properly admitted, points decidedly in favor of interpreting the agreement to allow deduction of franchise fees. (*Pacific Gas*, *supra*, 69 Cal.2d at p. 39

19

[evidence admissible if it does not "add to, detract from, or vary the terms" of a contract].)

Goldman testified that, with the prospect of a competing mall opening nearby, the parties bargained to allow plaintiff to receive a rent reduction if its Net Sales fell below $800,000 in exchange for plaintiff committing to stay at the Glendale Galleria until 2014 and to remodel its restaurant. Goldman also testified that Grossman agreed Article 5(h) allowed plaintiff to exclude its franchise fees to La Salsa when calculating Net Sales. That the parties agreed to a "safety net" from which plaintiff could deduct franchise fees is understandable considering Goldman's testimony that he agreed to a lease extension in the face of a competing mall opening nearby, he agreed to remodel the restaurant, and his franchise fee obligations put him at a competitive disadvantage vis-à-vis other food court tenants. Goldman's testimony was also consistent with the text of the lease for the reasons we set forth in our discussion of Article 5(h)'s susceptibility to plaintiff's interpretation.

This is substantial evidence supporting the verdict, and we do not reweigh the evidence or parse other testimony or exhibits to see if the trial court might have reached a contrary conclusion. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398 [when reviewing for substantial evidence court does not reweigh the evidence on appeal]; *Picerne Construction Corp. v. Villas* (2016) 244 Cal.App.4th 1201, 1209 ["If substantial evidence exists, it is of no consequence that the trial court believing other evidence or drawing other reasonable inferences might have reached a contrary conclusion"].) But we briefly highlight why the extrinsic evidence supporting defendant's interpretation of the lease is comparatively weaker.

Defendant points to plaintiff's prior failure to deduct franchise fees as evidence the parties never intended to permit such a deduction, but Goldman testified he incorrectly believed plaintiff had been deducting franchise fees from Net Sales all along. Goldman explained plaintiff did not deduct franchise fees while its sales were strong—so strong, in fact, that plaintiff at times paid defendant additional rent. According to Goldman, it was not until plaintiff's sales plummeted that Goldman looked into the reduced rent provision

20

in the lease and discovered plaintiff was not excluding franchise fees from Net Sales. The trial court noted that Goldman was the "only percipient witness for either party" to testify about lease negotiations, his testimony in that regard was "uncontradicted," and the court found it "highly credible." That credibility finding is entitled to deference on appeal (*People v. Williams* (2015) 61 Cal.4th 1244, 1262), and we agree in any event that Goldman's testimony was internally consistent and a reasonable explanation for the absence of deductions in prior years.

The testimony of Dix, defendant's retail leasing custom and practice expert, does not convince us the parties intended to require plaintiff to calculate Net Sales with franchise fees included. Indeed, Dix conceded he was not a part of the lease negotiations between the parties, so his testimony is of limited relevance. Moreover, what he did testify to—that industry custom permits exclusion of taxes but not expenses from Net Sales—is not particularly helpful to defendant in any event. As we have already explained, we see significant similarities between sales taxes and the franchise fees plaintiff was compelled to pay.

Defendant further argues the trial court's weighing of the evidence accorded too much weight to defendant's unexplained decision not to produce Grossman as a witness, but we find the argument unpersuasive. Substantial evidence supports the trial court's verdict regardless of whether it considered defendant's evidence "with distrust" under Evidence Code section 412. We also reject defendant's argument that the trial court improperly allowed plaintiff to testify concerning statements made by Grossman that in its view were "lay opinion as to [the] meaning and effect of a contract." What the trial court properly did, and what we have done, is consider Grossman's statements to determine the mutual intent of the parties.

C.    *Plaintiff Adequately Proved Damages*

Defendant argues plaintiff should have provided cancelled checks or a check registry to show the amounts it paid to La Salsa rather than relying at trial upon a summary of such records. Plaintiff points out, in response, that it had given the

21

underlying records to defendant, offered to bring them into court, explained the significance and provenance of the amounts provided, and established, through Goldman's testimony, how the summary had been prepared.

The trial court ruled that plaintiff's summary—which included not just the amounts it paid in franchise fees but also its gross sales, Net Sales, the difference between the rent plaintiff actually paid and how much it owed under Article 1.35's reduced rent provision, and interest calculations—was admissible as a compilation of voluminous business records. (Evid. Code, § 1523, subd. (d).) That ruling is sound. (See, e.g., *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 293-294 [schedule comprising "general compilation of documents that could not be examined individually by the court without great loss of time" admissible]; *Vanguard Recording Society, Inc. v. Fantasy Records, Inc.* (1972) 24 Cal.App.3d 410, 418-419 [under predecessor to Evidence Code section 1523, "a summary of business records consisting of numerous accounts or other writings that cannot be examined in court without great loss of time, is admissible in evidence upon a showing that the actual business records are entitled to admission" and the person who prepared or oversaw the preparation of such summary may testify to its contents].)

DISPOSITION

The judgment is affirmed.  Plaintiff is to recover its costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.




We concur:



TURNER, P.J.



RAPHAEL, J.*

---

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23